756 F.2d 1304
 1985-1 Trade Cases 66,568
 REPUBLIC AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
American Express Travel Related Services, Associated Travel
Nationwide, Intervenors.
AMERICAN SOCIETY OF TRAVEL AGENTS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
National Passenger Traffic Association, Intervenor.
AIR TRAFFIC CONFERENCE OF AMERICA, a DIVISION OF AIR
TRANSPORT ASSOCIATION OF AMERICA, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
INTERNATIONAL AIR TRANSPORTATION ASSOCIATION, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
ASSOCIATION OF RETAIL TRAVEL AGENTS, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
 Nos. 83-1656, 83-1779, 83-1780, 83-1916 and 83-1917.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 13, 1984.
Decided March 12, 1985.
 
 Bert Rein, Washington, D.C., for petitioner.
 Tom Rey and Ronald J. Green, Washington, D.C., for respondent.
 Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.
 BOWMAN, Circuit Judge.
 
 
 1
 This is a petition for review of Civil Aeronautics Board Orders (Orders) 82-12-85, 99 C.A.B. 1 (1982) and 83-3-127, 100 C.A.B. 409 (1983). These orders approved, after modification, five agreements among domestic and international airlines regulating the marketing of air transportation. Appellants contend that the decision of the Civil Aeronautics Board (the Board) granting only temporary antitrust immunity to the parties to these agreements and the selective disapproval of certain provisions of the agreements is contrary to the Airline Deregulation Act and is not supported by the record. We find the Board's construction of the statute to be reasonable and in conformance with the intent of Congress. We also find the conclusions of the Board to be supported by substantial evidence. We affirm the Board's orders.
 
 
 2
 I. Background.
 
 
 3
 The Airline Deregulation Act of 1978, Pub.L. No. 95-504, 92 Stat. 1705 (codified as amended in scattered sections of 49 U.S.C.) (ADA) represents a fundamental change in the perspective of the federal government toward the airline industry. With the passage of the ADA, the airlines, which had been subject since 1938 to pervasive price, routing, and marketing regulations, were freed to compete with one another in those areas. In the last six years many changes have taken place as the airlines have sought their way in a competitive environment. Results of deregulation include the airlines' use of fare discounts to attract customers, the advent of new "no frills" carriers offering inexpensive air transportation, and the airlines' exercise of their new freedom to enter or leave route markets as they see fit.
 
 
 4
 At issue in this case is the potential use by airlines of new methods of selling airline tickets. For many years, the traveling public has had only two major outlets for the purchase of airline tickets--the airline itself or an accredited agent.[1] A third option available to some large organizations is the use of in-house business travel departments (BTDs), which have the authority to write tickets for which they are billed as regular customers, i.e., at full price less any discount negotiated by the organization with the issuing airline. All this, and more, is governed by the agreements which are the focus of this proceeding.
 
 
 5
 II. Parties.
 
 
 6
 A. PETITIONERS.
 
 
 7
 Republic Airlines, Inc. is an airline based in Minneapolis, Minnesota. Along with most of the airlines in North America, Republic is a member of the Air Transport Association of America (ATA), a trade association. ATA's and its members' interests in this proceeding are represented by the Air Traffic Conference of America (ATC), the division of ATA which deals with the marketing of air transportation. The International Air Transport Association (IATA) is a trade association representing foreign air carriers in the United States. ATC and IATA administer the agreements at issue in this proceeding. The Association of Retail Travel Agents, Ltd. (ARTA) is an association of retail travel agents who specialize in meeting the travel needs of individuals. The American Society of Travel Agents, Inc. (ASTA) is a parallel trade association which represents most of the remaining travel agents operating in the United States. ASTA and ARTA represent their members in their relationships with ATC and IATA. The petitioners seek to have the Board's actions declared unlawful and to have the orders remanded for further consideration by the Board.
 
 
 8
 B. Respondent.
 
 
 9
 The respondent in this case is the Civil Aeronautics Board, the federal agency charged with responsibility for the economic regulation of the airline industry. Under the terms of the ADA, the Board will cease to exist on December 31, 1984. Thereafter, the duties of the Board with respect to the matters covered by the orders here in question will be assumed by the Department of Justice. The Board argues that its orders should be affirmed.
 
 
 10
 C. Department of Justice.
 
 
 11
 The Department of Justice (DOJ) was a party in the proceedings before the Board. It supports the Board's position and joined the Board in filing a brief in this case.
 
 
 12
 D. Intervenors.
 
 
 13
 Associated Travel Nationwide (ATN), an association of large-volume travel agents, intervened on the side of petitioners and filed a two-page brief adopting the position of petitioners' briefs. American Express Travel Related Services, Inc., (Amex) is one of the largest travel agencies in the United States. Amex intervened in the proceeding before this Court seeking affirmance of the Board's orders. The National Passenger Traffic Association (NPTA) is a trade association representing BTDs of major corporations, businesses, and non-profit corporations and quasi-public agencies including the Boy Scouts of America, the Muscular Dystrophy Association, and the Port Authority of New York and New Jersey. NPTA, an original party to the action before the Board, also intervened in this action seeking affirmance of the Board's orders.
 
 
 14
 III. The Agreements At Issue.
 
 
 15
 The current marketing system is controlled by agreements entered into on behalf of the airlines by ATC and IATA with the advice and consultation of ASTA and ARTA. Five interrelated agreements provide a comprehensive travel agent system available to any member airline.
 
 
 16
 So-called "exclusivity" or "standards adherence" provisions of the agreements prohibit an airline from selling tickets except through agents who meet the criteria established by the agreements for the granting of accredited agent status. Under these criteria an agent must: (1) be financially stable; (2) have an experienced manager for each agency location; (3) have at least one person for each agency outlet with experience in writing airline tickets; (4) sell airline tickets only from approved locations which are open to the public; (5) be open on a regular schedule for at least 35 hours a week; and (6) refrain from doing more than 20% of its business with itself or receiving commissions on sales to any company holding an 80% or greater controlling interest over it. IATA additionally prohibits any accredited agent from maintaining an office in an airport.
 
 
 17
 The exclusivity provisions operate on both the accredited agents and the airlines. Agents must satisfy the above-mentioned criteria in order to gain accredited agent status and must continue to comply with them to retain their accreditation. The airlines are forbidden from doing business with unaccredited agents.
 
 
 18
 IATA and ATC maintain staffs to process applications for agent accreditation. Typically, applications for accreditation are acted upon within two months. IATA and ATC each appoint for a five-year term a Travel Agency Commissioner to whom an unsuccessful applicant may appeal. If the Travel Agency Commissioner's decision is adverse to the applicant, arbitration is available.
 
 
 19
 Once accredited, an agent may seek appointment to sell airline tickets. ATC airlines automatically appoint agents once they have received accreditation, although each member airline has reserved the right to decline to use a given agent. IATA appointment is not automatic; an accredited agent is not able to market a given airline's tickets until the agent has been approved by that airline. In practice, however, most IATA airlines give general appointment authority to the IATA Agency Administrator. Subject to the just-mentioned niceties of the appointment process, each accredited agent has the authority to write a ticket for travel on any route of any airline that is a member of ATC or IATA--a process called interlining. All airlines and accredited agents participate in the Area Settlement Plan (ASP), a clearinghouse in each of several regions which makes payments to the proper airlines and pays commissions to the travel agents for the tickets written during each reporting period.
 
 
 20
 In a similar fashion, IATA operates a cargo agency accreditation and settlement system.[2] As with passenger sales agents, IATA cargo sales agents must comply with established criteria in order to receive accreditation. The accreditation standards and the monopoly of the cargo travel agents are protected by exclusivity. Settlement is handled through IATA's cargo accounts settlement system, which functions in a manner similar to the ASP.
 
 
 21
 IV. The Proceedings Before the Board.
 
 
 22
 A. Initiation of the Investigation.
 
 
 23
 The proceeding that culminated in the orders now under review was initiated on September 13, 1979 in Order 79-9-64 (unpublished). See Joint Appendix (J.A.) at 48-70. That order commenced "an investigation to determine how competition can best be introduced into the entire [airline passenger and cargo] marketing system." Id. at 52. In light of the changes enacted by the ADA, the Board initiated this investigation sua sponte as part of its comprehensive review of economic regulation of the airline industry.
 
 
 24
 Before passage of the ADA, the airlines were required to submit all joint operating agreements, such as those under review here, to the Board for approval. Anticompetitive agreements could be approved by the Board if they were found to secure important public benefits or to meet serious transportation needs. Anticompetitive agreements thus approved by the Board were entitled to antitrust immunity, which the Board had no discretion to deny. The ADA made two significant changes in this process. First, submission of joint operating agreements to the Board was made optional instead of mandatory. Second, the entitlement to antitrust immunity was limited; mandatory immunity was eliminated but the Board was granted the authority to confer discretionary immunity. In 1980, Congress amended the statute reinstating the entitlement to mandatory immunity in limited circumstances. See International Air Transportation Competition Act of 1979, Pub.L. No. 96-192, Sec. 27, 94 Stat. 35, 47-48 (1980), (codified at 49 U.S.C. Sec. 1384) (IATCA). Most of the agreements in question initially had been approved by the Board before the ADA was enacted. This approval carried with it automatic antitrust immunity. Post-ADA amendments to the agreements, however, were before the Board for its approval at the time of the September 13 initiating order. The Board elected to deal with all the agreements and pending amendments in the proceeding set in motion by its initiating order.
 
 
 25
 B. Hearing Before the Administrative Law Judge.
 
 
 26
 The Administrative Law Judge (ALJ) originally assigned to the proceeding, William H. Dapper, divided the investigation into five components: (1) accredited agent exclusivity and other market entry requirements; (2) other agreements affecting passenger marketing; (3) agreements affecting cargo; (4) payment to travel agents of commissions on government travel; and (5) wholesale and retail pricing competition. Phases four and five were severed from the proceeding, leaving passenger and cargo marketing agreements and the question of agent exclusivity to be resolved therein.[3] Judge Dapper resigned before the case reached the hearing stage, and he was replaced by ALJ Ronnie A. Yoder. The hearing on phases one through three was commenced on June 29, 1981. Fifty-seven days of testimony were heard over a period extending to November 9, 1981. Forty thousand pages of exhibits were submitted in addition to oral testimony.
 
 
 27
 The ALJ first examined the agreements to determine if they substantially reduced competition. The ALJ found several provisions to be anticompetitive and removed them from the agreements. These included IATA's prohibition on travel agencies located in airports, the prohibition on an airline paying a commission to another airline for interline ticket sales, and ATC's prohibition on payment of commissions to unaccredited ticket marketers. Otherwise, he found that the agreements did not substantially reduce competition. In particular, he found that neither the agent exclusivity provisions nor the self-dealing provisions preventing BTDs from becoming travel agents imposed significant anticompetitive restraints. The ALJ found the agreements, as modified by the removal of the provisions found to be anticompetitive, to be in the public interest and procompetitive. He further found that antitrust immunity was not mandatory, but that antitrust immunity should be granted in the exercise of the Board's discretion in order to preserve the public benefits flowing from the agreements.
 
 
 28
 C. The Board's Decision.
 
 
 29
 1. Overview.
 
 
 30
 In accordance with the terms of its initiating order, the Board took review of the ALJ's decision. See Order 79-9-64 at 4, J.A. at 54. Briefs were filed with the Board and oral argument was heard on September 15 and 16, 1982.
 
 
 31
 The Board reviewed the agreements as required by 49 U.S.C. Sec. 1382(a)(2)(A)(i) to determine if any of their provisions substantially reduced competition. The result of this review was the Board's disapproval as anticompetitive of several provisions of the agreements. The Board disapproved outright the exclusivity provisions which foreclosed the ASP to unaccredited agents and the provisions containing IATA's ban on in-airport travel agencies. The Board disapproved outright the balance of the exclusivity provisions insofar as they related to online sales, i.e., sales involving travel only on one airline, that airline being the agent's principal. Additionally, the Board disapproved as being anticompetitive the exclusivity provisions regarding interline sales, but nonetheless temporarily allowed those provisions to continue during a transitional period lasting until December 31, 1984. The Board deferred until December 31, 1984 its disapproval of the provisions preventing BTDs from becoming accredited agents in order to give the airlines an opportunity to fashion an alternative method of compensating BTDs for the work they perform in preparing and processing tickets. The Board found that none of the disapproved exclusivity provisions was necessary to meet serious transportation needs or to secure important public benefits.
 
 
 32
 The Board next examined the remainder of the agreements, concluded that no serious anticompetitive concerns remained and approved the expurgated agreements under the general public interest provisions of Sec. 1382(a). Because the Board viewed the agreements, minus the anticompetitive provisions it had disapproved, as posing no serious antitrust concerns and as largely procompetitive, it found that indefinite antitrust immunity was not required. Rather, the Board found that only a temporary grant of antitrust immunity was needed to cover the transition period preceding elimination of the BTD restrictions and interline sales exclusivity, which, as previously mentioned, will end on December 31, 1984.
 
 
 33
 2. Exclusivity.
 
 
 34
 a. Exclusivity--In General.
 
 
 35
 The Board disagreed with the ALJ's assessment of the impact of the exclusivity provisions on competition. While the ALJ looked at the exclusivity provisions in light of the historically small number of applicants who actually had been denied accredited agency status, the Board focused on the deterrent effect the restrictions might have on potential new and innovative forms of marketing. The Board concluded that by removing the exclusivity provisions and allowing airlines to deal with marketers outside of the common accreditation/conference agreement system, competition and marketing innovation would be encouraged. The Board commended the ALJ's attempt to accommodate non-agent marketers by permitting them to receive commissions on ticket sales, but it concluded that more was needed to permit marketing innovation and make possible a more competitive environment. Therefore, it disapproved the exclusivity provisions and struck them from the agreements.
 
 
 36
 The Board emphasized that its decision disapproving the exclusivity provisions is not intended to encourage any particular business decision by the airlines or the agents; its purpose is merely to allow an environment in which competition can occur between existing accredited agents and potential new marketers. The Board disagreed with the ALJ's conclusion that exclusivity was needed to preserve the benefits of common accreditation. The Board noted that the airlines have substantial incentives to continue to use the present system of common accreditation, given the efficiency, economy, ubiquity, and reputation of the accredited agents.
 
 
 37
 b. Exclusivity--BTDs.
 
 
 38
 With respect to the specific exclusivity provisions preventing BTDs from achieving agency status (and thus preventing them from negotiating for commissions), the Board viewed the services conducted by BTDs as significant and saw no valid reason for an agreement among the competing carriers to deny compensation to the BTDs for the services they perform. The Board considered these provisions tantamount to a group boycott of a class of persons providing services similar to those provided by the accredited agents, and thus found them to be anticompetitive.
 
 
 39
 The Board pointed out that nothing in its decision requires the airlines to pay a particular level of compensation to the BTDs. The Board noted that its reform of tariff regulation[4] has opened the door for negotiated price concessions obtainable without seeking accreditation. Each airline always has retained the power to negotiate as to the level of commissions paid to each agent. The Board's decision gives the airlines the option of either opening the accreditation system to BTDs or negotiating individually with each BTD in order to determine a mutually agreeable level of compensation. As the Board notes, the antitrust laws permit an airline to refuse to deal with a particular purchaser if acceptable terms cannot be negotiated. What is prohibited is simply the collective refusal to deal with the BTDs in regard to price concessions or other forms of compensation.
 
 
 40
 The Board recognized that immediate removal of the BTD restrictions might cause persons to seek agency status not because they wish to undertake all of the burdens as well as the benefits of accredited status, but merely to gain price concessions. The Board further recognized that it would take time for the market to adjust to the new freedom afforded by tariff deregulation. See note 4 supra. In order to avoid disruption of the accredited agent system and to give the airlines an opportunity to find other means for compensating BTDs, the Board deferred disapproval of and granted continued antitrust immunity for the BTD provisions until December 31, 1984. The Board noted that, should the airlines fashion an alternative means of compensating BTDs, the provisions excluding them from accreditation might lose their anticompetitive effects, and thus not require disapproval.
 
 
 41
 c. Exclusivity--Interlining.
 
 
 42
 An issue raised by the elimination of accredited agent exclusivity is whether and under what conditions potential new non-accredited agents will be allowed to interline. The common accreditation scheme allows any accredited agent to interline with any member airline unless the airline specifically has refused to permit a particular agent to write tickets for its flights. The airlines argued that if exclusivity were removed interlining might disappear because of the loss of money or goodwill that may ensue if an airline issues tickets through an unqualified or financially insolvent agent. The Board answered this argument by noting that airlines are unlikely to appoint unqualified agents. If an error is made on an agent-issued interline ticket, the airline that authorized issuance of that ticket bears ultimate financial responsibility for the error and any resulting loss of goodwill will reflect on that airline. Because of the airlines' past reliance on the accreditation standards to prevent such problems, the Board continued its approval of exclusivity for interline sales until December 31, 1984 in order to allow for an orderly transition to a marketing system in which accredited agent exclusivity is not mandated by agreement among the airlines. As with the BTD restrictions, the Board found that the interlining provisions required antitrust immunity for the transitional period, since those provisions substantially reduced competition.
 
 
 43
 3. The ASP.
 
 
 44
 The last significant effect of the Board's order was to open the ASP to unaccredited agents. The Board held that to bar access to this low cost, efficient system of settling airline/agent debts clearly would be anticompetitive since it viewed the ASP as an essential facility of commerce under Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).
 
 
 45
 4. Petition for Reconsideration.
 
 
 46
 The petitioners and intervenors requested reconsideration by the Board. The arguments raised on reconsideration substantially were the same as those initially considered by the Board, the only new arguments being those challenging the fairness of the Board's procedures. The Board reaffirmed its decision in Order 83-3-127, 100 C.A.B. 409 (1983).[5] (See J.A. at 465-506.)V. Position of the Petitioners.
 
 
 47
 Petitioners charge that the Board exceeded its authority by striking certain provisions, such as the exclusivity provisions, from the agreements without first balancing the anticompetitive effects of those provisions against the public benefits provided by the agreements as a whole. Petitioners argue that the Board, by finding that the agreements, once stripped of those provisions, are procompetitive, abandoned its responsibility under Sec. 1382(c) to make detailed findings after engaging in a balancing-of-interests analysis. They argue that such findings, if properly made, would have required an indefinite grant of antitrust immunity under Sec. 1384. Petitioners further contend that, even if they are not entitled to antitrust immunity as a matter of right, the acknowledged public benefits of the agreements compel a grant of antitrust immunity in the exercise of the Board's discretion under Sec. 1384 and that the Board's failure to grant such immunity was an abuse of discretion. Petitioners also challenge, as being unsupported by substantial evidence, the Board's determination that the exclusivity provisions are not necessary to meet serious transportation needs or to secure important public benefits.
 
 
 48
 In addition to their arguments regarding the construction of Secs. 1382 and 1384, petitioners also claim that the orders are tainted by certain irregularities in the procedures used by the Board. Petitioners assert that: (1) the Board conducted an illegal parallel proceeding at the time of the ALJ's consideration of the case, which rendered his hearing meaningless; (2) the Board violated the Administrative Procedure Act (APA) by reaching a decision in secret rather than at a public meeting; and (3) the Board prejudicially relied on extra-record evidence in reaching its decision.
 
 
 49
 VI. Discussion.
 
 
 50
 A. Introduction.
 
 
 51
 It is not for this Court to pass judgment on the wisdom of the Board's decision. Our proper task is much more limited, being merely to decide whether the Board has proceeded in a lawful manner, whether the challenged actions of the Board are within its statutory authority and, if so, whether they are supported by substantial evidence. With that in mind, we turn to the issues that petitioners have raised for our determination.
 
 
 52
 After outlining the statutes under which the Board reached its decision, we deal first with the Board's selective disapproval of particular restrictive features of the joint operating agreements. Next, we decide whether the Board was required to confer indefinite antitrust immunity to the parties participating in the agreements. We then discuss the substantiality of the evidence supporting the Board's decision. Finally, we deal with the fairness of the Board's procedures, and examine whether the Board complied with the requirements of the APA.
 
 
 53
 B. Statutory Framework.
 
 
 54
 In its substantive aspects, this case turns on whether the Board orders that petitioners' challenges are authorized by the ADA and the 1980 amendments to that act. The Board is entitled to considerable deference in interpreting the statutes under which it operates. Northwest Airlines, Inc. v. Goldschmidt, 645 F.2d 1309, 1315 (8th Cir.1981). We are not called on to determine the best interpretation of the statute, but only to determine if the Board's interpretation is " 'sufficiently reasonable' to be accepted by a reviewing court." Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); see also Train v. Natural Resources Defense Council, Inc., 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975).
 
 
 55
 The provisions of the ADA and the IATCA under which the Board's review of the airlines' agreements took place are found at 49 U.S.C. Secs. 1382, 1384.[6] These statutes spell out the circumstances under which the Board may approve agreements and grant antitrust immunity to airlines for the purpose of entering joint operating agreements, such as the ones in question here. Submission of such agreements to the Board is no longer mandatory; however, the agreements considered here received initial approval under the former statute. See supra p. 1309.
 
 
 56
 Section 1382 gives the Board the power to review agreements and to approve or disapprove them. The Board may not approve an anticompetitive agreement unless it finds that the agreement is necessary to "meet a serious transportation need or to secure important public benefits, including international comity or foreign policy considerations, and it does not find that such need can be met or such benefits can be secured by reasonably available alternative means...." 49 U.S.C. Sec. 1382(a)(2)(A)(i). The provisions of Sec. 1382(a)(2)(A)(i) may be paraphrased as presenting three separate questions:
 
 
 57
 (1) Does the agreement substantially reduce or eliminate competition?
 
 
 58
 If the answer to question one is "yes," proceed to question two.
 
 
 59
 (2) Is the agreement necessary to meet a serious transportation need or to secure important public benefits, including international comity or foreign policy considerations?
 
 
 60
 If the answer to question two is "no," the analysis ends and approval must be denied. If the answer to question two is "yes," then the Board proceeds to the last question.
 
 
 61
 (3) Can the benefits provided by the anticompetitive agreement be secured by reasonably available alternative means having materially less anticompetitive effects?
 
 
 62
 If the answer to question three is "no," then the anticompetitive agreement is approved and the parties are entitled to immunity under the second sentence of Sec. 1384.
 
 
 63
 C. The Board's Power to Consider Individual Provisions of an Agreement.
 
 
 64
 In this case, the Board severed and disapproved the provisions it found to be anticompetitive and proceeded to review the balance of the agreements. Finding the agreements absent the disapproved provisions to be procompetitive, the Board approved the agreements without making public benefits findings under Sec. 1382(a)(2)(A)(i). Petitioners challenge this method of analysis, asserting that the Board is not empowered to excise anticompetitive provisions without first making a finding as to public benefits under Sec. 1382(a)(2)(A)(i). Petitioners assert that if the Board had entered this phase of the analysis, it would have concluded that the excised provisions are necessary and in the public interest and thus would have approved them. We disagree with the petitioners' legal argument, and we believe that the related question of the Board's determination that the provisions are not needed to preserve the benefits of the agreements is supported by substantial evidence.
 
 
 65
 Petitioners' legal position is inconsistent with a long history of Board precedent. In Air Cargo, Inc., 9 C.A.B. 468 (1948), the Board asserted and used its power to condition approval of an agreement on the acceptance by the parties of changes in the agreement. We see no practical or legal distinction between this approach and that taken by the Board here, which was to excise certain provisions and grant approval to the balance of the agreements. In both cases, the Board exercised a line item veto over provisions of the agreements, and left the parties with the choice of accepting the Board's decision, redrafting and resubmitting the agreements for Board approval, or appealing the Board's decision. See also Pan American National Agreements, 28 C.A.B. 960, 963 (1958). The Board continued to exercise this power after passage of the ADA and the IATCA. In UATP-1976 Agreements, 85 C.A.B. 2481 (1980), the Board followed analytical steps virtually indistinguishable from those used in this case in approving a universal airline credit card program. The Board went through a competitive analysis, excised certain anticompetitive provisions, found the balance of the agreement procompetitive, and approved the agreements without granting antitrust immunity.
 
 
 66
 The courts have upheld the power of the Board to condition its approval on the acceptance of changes in an agreement. See, e.g., National Air Carrier Association v. C.A.B., 436 F.2d 185, 190-91 (D.C.Cir.1970); McManus v. C.A.B., 286 F.2d 414, 419 (2d Cir.), cert. denied, 366 U.S. 928, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961); cf. Frontier Airlines, Inc. v. C.A.B., 621 F.2d 369 (10th Cir.1980) (Board's authority to approve or disapprove proposed termination in airline service to a community includes power to grant termination only on specific conditions). The Board's action in the instant case is logically consistent with that approach and is a reasonable interpretation of the statute.
 
 
 67
 Moreover, it is inaccurate to consider the agreements in question as indivisible documents. First, they are the product of many years of revision and amendment; they were not drawn up as an integrated whole for initial introduction in this proceeding. Second, as found by the Board, there has been no compelling showing that the excised provisions are necessary to preserve the benefits of the agreements.
 
 
 68
 Petitioners also assert that even if the Board has the power to excise anticompetitive provisions from an agreement, it only may do so following a public interest analysis under Sec. 1382(a)(2)(A)(i). We do not agree. Under our reading of the statute, a public benefits analysis is required only if an anticompetitive provision is to be approved as being necessary to meet a serious transportation need or to secure important public benefits. The Board found that the exclusivity provisions raised serious antitrust concerns, but also found that these provisions were not needed to preserve the benefits of the agreements. We find the Board's determination to be supported by substantial evidence in the record and that its methodology is based upon a proper construction of the statute.
 
 
 69
 As the Board points out, a holding that the Board could not sever and disapprove specific provisions before approving the remainder of an agreement would lead to unacceptable results. Knowing that the Board was faced with an "all or nothing" proposition, the airlines would have an incentive to include anticompetitive provisions in an attempt to force antitrust immunity for otherwise procompetitive agreements. Confronted with such an attempt, the Board would be placed in an extremely difficult position: it would be required to disapprove an essentially beneficial agreement in its entirety, or to approve it with all its anticompetitive baggage. Over three decades of Board and court precedent, as well as common sense, dictate that the Board should have the power to consider and to remove individual anticompetitive provisions from an agreement. Moreover, we believe that this conclusion is consistent with Congressional intent as reflected in the ADA.
 
 
 70
 D. Antitrust Immunity.
 
 
 71
 Petitioners assert that the agreements are entitled to antitrust immunity under the mandatory immunity provisions of Sec. 1384. This provision requires an antitrust exemption pursuant to the analysis conducted under Sec. 1382(a)(2)(A)(i) "to the extent necessary to enable such person to proceed with the transaction specifically approved...." Petitioners argue that they will not enter the agreements without antitrust immunity, and that because the agreements produce public benefits, antitrust immunity should be granted.
 
 
 72
 A limited mandatory immunity provision was reinstated to the Board's governing statute by the IATCA. It applies in situations where the Board determines that an agreement, though clearly anticompetitive, should be approved in the public interest. This may arise when the Board, having performed the analysis required by Sec. 1382(a)(2)(A)(i) for anticompetitive provisions which secure important public benefits, has determined that, even though an agreement substantially lessens competition, the public benefits secured by the agreement outweigh the antitrust concerns. This method of analysis is similar to the Bank Merger Act test, 12 U.S.C. Sec. 1828, under which a bank merger, though anticompetitive, may be approved and immunized from the antitrust laws if it is found that the anticompetitive concerns are "clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." Id. at (c)(5)(B); See H.R.Conf.Rep. No. 716, 96th Cong.2d Sess. 23 reprinted in 1980 U.S.Code Cong. & Ad.News 78, 85.
 
 
 73
 Examination of Secs. 1382 and 1384 and their legislative history clearly reveals that antitrust immunity for airline agreements is intended to be the exception and not the rule. Only those agreements subject to a serious risk of antitrust attack, yet providing public benefits not reasonably obtainable by other means, are entitled to mandatory antitrust immunity, and then only to the extent necessary to enable the parties to proceed. See H.R.Conf.Rep. No. 716, supra. The Board's authority to grant antitrust immunity is to be exercised only when the Board determines it is in the public interest to do so, and only to the extent necessary to enable the parties to engage in the specific transactions approved by the Board. See H.R.Rep. No. 1211, 95th Cong., 2d Sess. 18, reprinted in, 1978 U.S.Code Cong. & Ad.News 3737, 3754.
 
 
 74
 The Board has found that the benefits of common accreditation are available without the anticompetitive restraints of exclusivity. Except for the transitional antitrust immunity required for the BTD and interline exclusivity provisions, both the Board and the ALJ determined that the mandatory immunity provisions of Sec. 1384 were not applicable to the agreements here approved by the Board. The ALJ did confer discretionary immunity to the agreements, but the Board found that such immunity is not necessary for the parties to proceed with the agreements as modified. The Board recognized that antitrust concerns are present, but found that the agreements as modified do not substantially reduce competition or raise a serious risk of antitrust litigation. Antitrust immunity is appropriate only when antitrust litigation poses a serious threat to the continued operation of an agreement that produces important public benefits. It is not realistic to expect a flood of antitrust lawsuits attacking a substantially procompetitive agreement. Moreover, the statute requires antitrust immunity only "to the extent necessary to enable [the parties] to proceed with the transaction specifically approved by the Board." 49 U.S.C. Sec. 1384 (emphasis added). Here, the agreements approved by the Board were found to be essentially procompetitive and not found to raise serious antitrust concerns. Under such circumstances, antitrust immunity is not necessary for the parties to proceed with the transaction. See supra n. 5.
 
 
 75
 Petitioners seem to read the statute as authorizing immunity on demand for any agreement which produces public benefits. Neither the text nor the legislative history of the statute supports such a reading, which would make the grant of antitrust immunity turn on the subjective desire of the parties to avoid antitrust litigation. This desire is one shared by all businesses subject to the Sherman Act, and we do not believe that it is relevant to the Board's task. Petitioners are entitled to immunity on the basis of an objective demonstration that the statutory requirements for such immunity have been met. Once the Board made its determination that the anticompetitive provisions were not needed to meet any serious transportation needs or to secure important public benefits, the analysis ended insofar as mandatory immunity was concerned. Thus, we hold that the Board correctly found that antitrust immunity for these agreements is not required by Sec. 1384.
 
 
 76
 With respect to discretionary immunity under the first sentence of Sec. 1384, DOJ has indicated that it will not file an antitrust action against the agreements as approved by the Board, and has voiced its satisfaction with the modified agreements from an antitrust standpoint. While the ALJ granted discretionary immunity to the agreements for an indefinite period of time, the Board concluded that such immunity was unnecessary. Given the fact that both the ALJ and the Board found the agreements, as modified, to be procompetitive, we cannot say that the Board's refusal to bestow antitrust immunity was an abuse of discretion.E. The Substantiality of the Evidence Supporting the Board's Decision.
 
 
 77
 Petitioners attack as not supported by substantial evidence the Board's conclusions regarding (1) the exclusivity provisions, (2) the rules barring BTDs from becoming accredited agents, and (3) the opening of the ASP to agents selected outside the common accreditation rules. Having carefully reviewed the record and the arguments of the parties, we hold that the Board's conclusions on these specific features of the agreements are adequately supported by the record.
 
 
 78
 To avoid unduly prolonging an already lengthy opinion, we forego detailed discussion of the substantial evidence question, much of which necessarily would be repetitious of matters already covered. We do make, however, two general observations.
 
 
 79
 1. The Board's Forecasts of the Results of Its Decision.
 
 
 80
 It is apparent that much of the petitioners' disagreement is with the Board's forecasts of the results of its decision. For example, in reaching the conclusion that the withdrawal of exclusivity would not cause the airlines to abandon the common accreditation system, the Board made a factual determination "primarily of a judgmental or predictive nature." FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 813, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697 (1978). When making such a determination, "complete factual support in the record for the [Board's] judgment or prediction is not possible or required; 'a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.' " Id. at 814, 98 S.Ct. at 2121 (quoting FPC v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377 (1961)). The Board's forecasts must be accepted if they are "rational, based on a consideration of all the relevant factors, and adequately explained." National Small Shipments Traffic Conference, Inc. v. CAB, 618 F.2d 819, 830 (D.C.Cir.1980). After reviewing the Board's decision, we are satisfied that the Board's forecasts of the results of its decision satisfy the foregoing test and therefore must be accepted.
 
 
 81
 2. Consistency with the ALJ's Decision.
 
 
 82
 We find no merit in petitioners' suggestions that the Board's decision is suspect because it differs in some significant ways from the decision reached by the ALJ. This case does not turn on any issues of credibility. Cf. Ward v. NLRB, 462 F.2d 8, 12 (5th Cir.1972). Accordingly, the Board is not required to accord a high degree of significance to the ALJ's decision. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951). Instead, it is the Board's responsibility to make findings of fact and to decide the matter; if substantial evidence supports both the ALJ's result and the Board's result it is the Board's choice that governs. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). In any event, there is here no real inconsistency between the ALJ's factual analysis and the Board's decision. The Board considered the same facts that the ALJ considered, but it brought to those facts a different vision of the future and of the requirements of the procompetitive policy mandated by Congress. We find the Board's conclusions to be rational and adequately supported by the record.
 
 
 83
 F. The Fairness of the Procedures Followed by the Board.
 
 
 84
 Petitioners contend that by receiving memoranda and advice from its staff regarding the issues in the case, the Board bypassed the ALJ and rendered the proceedings, and his decision, meaningless. Petitioners contend that such actions on the part of the Board violate the APA, 5 U.S.C. Sec. 557(b), which they read as requiring the Board to wait until the ALJ has decided the matter before considering the issues in the case. Without deciding whether petitioners' reading of Sec. 557(b) is correct, the simple answer to their argument is that this section of the APA applies only to situations in which a formal hearing is required for the agency action being considered. See id. Sec. 557(a). No such hearing is required for the agency action here in question. See 49 U.S.C. Sec. 1382(a).
 
 
 85
 Petitioners further argue that discussions between Board members and Board staff concerning the case during the period prior to the Board's hearing violated 5 U.S.C. Sec. 552b, commonly known as the Sunshine Act. That provision requires that, with certain exceptions not relevant here, all deliberation on and disposition of agency business be conducted in public. Petitioners allege that between August and December of 1982, nineteen meetings were held between Board members and staff concerning the case. There never were more than two members of the Board present at any of these meetings. 100 C.A.B. at 443-44 (1983). In addition, various memoranda, including a draft of a proposed opinion by the Board, were circulated among the members of the Board prior to any public hearing by the Board as a whole. Petitioners contend that through these actions the Board reached its decision in secret prior to the December 9 and 16 meetings, thus shielding the decision-making process from the full scrutiny of a public hearing. We disagree.
 
 
 86
 The discussions between Board members and staff and the circulation of memoranda among Board members were activities common to any body of responsible public officials preparing to make an important decision. A review of the transcript of the public hearings reveals that although individual Board members may have had definable public policy orientations when entering the hearings, the decision was not cast in stone at the outset of the hearings. Section 552b was not intended to prevent Board members from receiving the advice of staff or to prevent the exchange of views between two Board members off-the-record. Rather, it was meant to prevent government agencies from meeting in secret as rulemaking bodies to deliberate and decide issues with public impact. See H.R.Rep. No. 880, 94th Cong., 2d Sess. reprinted in 1976 U.S.Code Cong. & Ad.News 2183. We are satisfied that the kind of activity forbidden by the Sunshine Act did not occur here.
 
 
 87
 Petitioners also assert that the Board based its decision on information not in the record. This allegation derives from a comment during the December 9, 1982 Board meeting by Board Chairman McKinnon regarding the possible role played by travel agents in bringing about the bankruptcy of Braniff Airways. (See J.A. 1504-05.) The Chairman mentioned Braniff's situation as an instance in which the availability of marketing alternatives outside the current accredited agent system might have been valuable to an airline. Petitioners seize on this observation to accuse the Board of giving controlling weight to evidence outside of the record. While the specific circumstances of Braniff's bankruptcy were not explored by the parties before the ALJ or the Board, we do not view the Chairman's comment as wholly unsupported by the record. His comment was in the context of a discussion of the power travel agents can exert for or against a given airline in the sale of tickets. Chairman McKinnon's point was supported by testimony of various airline representatives regarding the power of travel agents to divert passengers from one airline to another. 100 C.A.B. at 423. Moreover, the Board had previously dealt with matters relating to the restructuring of the Braniff route system, and it is within the scope of the Board's duties to monitor the economic health of the airline industry. The Board in Order 82-8-118, 97 C.A.B. 601, approved an amendment to the ASP to obligate participating airlines to provide alternate transportation to holders of agent-issued tickets on an ASP airline that had gone into default. This amendment was specifically designed to address the problem of agents' loss of confidence in an airline in financial difficulty. Given the Board's familiarity and experience with the problem, which was well known to the parties from the proceedings before the ALJ and before the Board, we cannot say that Chairman McKinnon's use of the Braniff illustration constituted reliance upon extra-record information by the Board.
 
 
 88
 Even assuming arguendo that Chairman McKinnon's comment constituted consideration of extra-record evidence in contravention of 5 U.S.C. Sec. 556(e), such consideration does not require reversal unless the petitioners were substantially prejudiced thereby. United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 530, 66 S.Ct. 687, 695, 90 L.Ed. 821 (1946). Significant evidence was presented in the administrative hearings pointing out the potential for agents to use their market power in retaliation against airlines for changes in marketing strategy. See J.A. at 973-76, 1001-08. Evidence also was presented at the hearings that the travel agents had used their market power to oppose United Airlines' effort to adopt an adjustment in commission rates for agent ticket sales. See J.A. at 1103-04. In light of this additional evidence which was before the Board, see Order 83-3-127, J.A. at 465, we conclude that the reference to Braniff was merely cumulative or illustrative and thus did not substantially prejudice the petitioners.
 
 
 89
 The orders of the Board are affirmed.
 
 
 90
 HEANEY, Circuit Judge, dissenting.
 
 
 91
 I dissent. The record in this case reveals that the present system of airline ticket marketing and distribution has worked well for over forty years. The travel agents have been competent and responsible. They make transportation planning and ticket purchase convenient and are easily accessible in every community across the country. The travel agent system has also served the airlines well. Perhaps more importantly, the agency system presently allows new and emerging air carriers to participate in an in-place marketing system for their service. These new entrants are thus better able to compete in more areas against the larger and more powerful air carriers which could market their services without the current agency system. The system also insures that foreign carriers are able to compete effectively in the United States market.
 
 
 92
 The record also shows that the Board's decision will inevitably put thousands of small travel agents out of business. The Board's decision to allow corporate Business Travel Departments (BTDs) to be recognized as travel agents, and its decision to allow large agents such as American Express to introduce automatic ticketing machines, will allow certain entities to skim the cream from the top of the business. Business travelers who ordinarily do not need extensive travel planning assistance, and others with simple travel needs, will turn to BTDs or automatic ticket machines. This leaves to the other smaller travel agencies the more difficult, time-consuming transactions which return less, if any, profit. Thus, many small agents probably will not survive when deprived of the simple, high-profit transactions. This will likely result in the loss of existing travel agent service for smaller communities across the country. And because the Board's order threatens the viability of the area settlement plan and other facets of the inter-airline system by removing antitrust immunity, it will place smaller domestic and international airlines at a distinct competitive disadvantage.
 
 
 93
 All of these harmful consequences to the existing air travel marketing and distribution system would have to be tolerated if the Board's manipulation of the system were consistent with the Federal Aviation Act and Airline Deregulation Act. In my view, however, the Board failed to engage in the public interest balancing analysis of the proposed agreements required by section 412, and consequently failed to grant antitrust immunity to the agreements under section 414. Thus, I would reverse the Board's order.
 
 
 94
 The majority opinion proceeds on the premise that the Board's order is the inevitable result of the Airline Deregulation Act, which "represents a fundamental change in the perspective of the federal government toward the airline industry." See supra p. 1307. Fundamental as this change may be, it did not concern the travel agent system. Congress made it clear that it did not intend to deregulate all aspects of the industry. See, e.g., H.Rep. No. 95-1211, 95th Cong., 2d Sess. 4, reprinted in 1978 U.S.Code Cong. & Ad.News 3737, 3739-40 ("While the committee has by no means concluded that total deregulation is desirable, we are persuaded that it is time for a moderate, controlled release of some regulatory fetters."); id. at 5-6, 1978 U.S.Code Cong. & Ad.News at 3741 ("[The statute's revised policy statement] directs the Board to stress competition, low-fare service, entry by new carriers, and avoidance of industry concentration.").
 
 
 95
 When it came to considering the inter-airline marketing agreements, Congress preserved a structure of regulatory review. It considered and rejected proposals to remove antitrust immunity. See Regulatory Reform in Air Transportation: Hearings Before the Subcomm. on Aviation, Senate Committee on Commerce, Science and Transportation, 95th Cong., 1st Sess. 206 (1977) (Testimony of John E. Robson, Chairman, CAB). It also considered and rejected a proposal to require de novo antitrust review of such agreements. See Oversight of Civil Aeronautics Board Practices and Procedures: Hearings Before the Subcomm. on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 94th Cong., 1st Sess. 1738-40, 1750-52 (1975) (Testimony of Donald I. Baker, Dep. Asst. Attorney General, Department of Justice). Instead, Congress selectively prohibited certain agreements regarding capacity level and price fixing. See 49 U.S.C. Sec. 1382(a)(2)(A)(iii). All other agreements it made subject to Board review in order to receive antitrust immunity. The legislative history indicates that Congress was aware of the travel agent inter-airline agreements now before the Court, and expected these agreements to be placed on the antitrust public interest balance. S.Rep. No. 95-631, 95th Cong., 2d Sess. 82 (1978) ("The bill requires that other agreements meet a public interest balancing test similar to that required under section 408 before antitrust immunity is conferred. The public interest balancing test would apply, for example, to those agreements covering baggage, ticketing, and travel agent arrangements.") (emphasis added). Thus, Congress did not intend that the inter-airline marketing agreements and travel agent system be subjected to the deregulatory changes affecting fare and route determinations. Moreover, I conclude from the legislative history that Congress intended continued antitrust immunity for these agreements so long as they serve the public interest--precisely because the existing system promotes easy entry by new carriers, avoidance of industry concentration, and Congress's other deregulation goals.
 
 
 96
 Congress's desire to preserve regulatory public interest analysis of these agreements for the purpose of granting antitrust immunity is defeated in this case by the Board's decision to excise anticompetitive provisions from the agreements in order to avoid such an analysis. As noted in the majority opinion, section 412 of the Airline Deregulation Act provides that the Board:
 
 
 97
 shall by order approve any contract, agreement, or request * * * that it does not find to be adverse to the public interest, or in violation of this chapter, except that--
 
 
 98
 (i) the Board may not approve or, after periodic review, continue its approval of any such contract, agreement, or request * * * which substantially reduces or eliminates competition, unless it finds that the contract, agreement, or request is necessary to meet a serious transportation need or to secure important public benefits, including international comity or foreign policy considerations, and it does not find that such need can be met or such benefits can be secured by reasonably available alternative means having materially less anticompetitive effects[.]
 
 
 99
 49 U.S.C. Sec. 1382(a)(2)(A).
 
 
 100
 The plain language of the statute directs the Board to evaluate proposed agreements in their entirety; it mentions nothing which would suggest that the Board is to dissect proposed agreements and analyze certain provisions in isolation. The fact that these agreements have operated for many years as an integrated system also suggests that if Congress desired that the Board engage in piecemeal review it would have said so explicitly in the statute.
 
 
 101
 The majority opinion asserts that the Board's excision of anticompetitive provisions is consistent with past Board practice and is supported by court decisions. Several cases have supported the Board's power to condition its approval of an agreement on the incorporation of certain amendments. See, e.g., Frontier Airlines, Inc. v. C.A.B., 621 F.2d 369, 371-72 (10th Cir.1980); National Air Carrier Association v. C.A.B., 436 F.2d 185, 190-91 (D.C.Cir.1970). But none of the cited decisions support the Board's practice in this case. National Air Carrier, for example, only held that the Board could approve an agreement for less than the full term proposed. 436 F.2d at 190-91. Frontier Airlines simply held that the Board had the power to require a carrier to provide temporary backup service to certain smaller communities--as a logical corollary of its statutory power to order a carrier to continue existing service to those communities. 621 F.2d at 371-72.
 
 
 102
 Thus, in both National Air Carrier and Frontier Airlines, the Board's authority was inherent in the power granted to it by Congress, and its action promoted the policy intended by Congress in enacting the pertinent statutes. Here, however, the Board's action directly contravenes Congress's clear intention that the anticompetitive aspects of the inter-airline agreements be weighed against transportation needs and other public benefits, and then analyzed in relation to any less anticompetitive alternatives. The Board's action is contrary to, rather than inherent in, the authority given to it by Congress under section 412.
 
 
 103
 It is readily apparent that the Board excised the anticompetitive provisions in an effort to manipulate the review process, avoiding the public interest balance and consequently avoiding a grant of antitrust immunity. I would remand the matter to the Justice Department, which now performs the Board's review function, with directions to engage in the balancing process required by section 412.
 
 
 104
 Accordingly, I would reverse the order of the Board.
 
 
 
 [1]
 In addition to these outlets, consumers may purchase air travel through tour operators who purchase airline seats wholesale and resell them to the public
 
 
 [2]
 ATC's method of handling cargo sales is not at issue in this proceeding
 
 
 [3]
 Although the actions of the Board regarding the cargo agency agreements are part of the matter now before us, the issues raised with respect to them are substantially the same as those presented by the passenger agency agreements. In the interest of brevity, we have chosen not to discuss them directly. As with the Board's decision regarding passenger agency agreements and the ASP, its decision on the cargo agency agreements is affirmed in all respects
 
 
 [4]
 See Order 81-11-58, 92 C.A.B. 1287 (1981). Prior to airline deregulation, any attempt to grant a discount to a purchaser was unlawful unless it was contained in a tariff filed with the Board. One month after the Board's initial order in this case, all tariff filing requirements were eliminated, thus giving the airlines more freedom to negotiate discounts with BTDs. See 100 C.A.B. at 83
 
 
 [5]
 The carriers have taken steps to comply with the Board's order by establishing the Airline Reporting Corporation (ARC) to administer a restructured accreditation program and a successor settlement system similar to the ASP. These agreements permit unaccredited agents to deal with the airlines and permit those agents access to the settlement system. ARC plans to begin operations immediately after antitrust immunity is withdrawn on December 31, 1984
 ARTA believes that some features of ARC's proposed method of operation are anticompetitive and has filed suit to enjoin its implementation. ARTA v. ATA, et al., Civil Action No. 84-2942 (D.D.C. filed September 23, 1984).
 ARTA also filed, on September 25, 1984, a petition for reconsideration by the Board, seeking a six-month extension of transitional antitrust immunity. ARTA argued that this extension would permit the airlines to modify the ARC to meet ARTA's concerns and would allow the D.C. District Court an opportunity to consider its antitrust suit. ARTA further argued that ARC could facilitate the dominance of airline marketing by a relatively limited number of carriers because only ATA carriers will own stock in ARC. ARTA also argues that the uniform bonding requirements and participation fees of the settlement plan constitute price fixing in violation of the antitrust laws.
 The Board rejected these arguments and denied ARTA's petition. Order 84-11-43. The Board noted that since ARC lacked exclusivity provisions, dominance by ATA carriers was impossible since carriers could always use unaccredited agents. Moreover, the Board observed that ATC's reply to ARTA's petition indicated that non-ATA carriers would be represented on the ARC board of directors, and that a mechanism would be established to permit travel agents and others to comment on ARC's operations and policies. ATC also stated that travel agents were excluded from ownership in ARC because of antitrust concerns.
 With respect to the settlement plan, the Board found that the bonding procedures and participation fees were not an attempt at price-fixing, but rather were intended to preserve the financial integrity of the ARC and were similar to arrangements approved by the courts in other joint ventures. After making these findings the Board disapproved ARTA's petition for an extension of antitrust immunity. The Board did note, however, that ATA indicated that a brief extension of antitrust immunity may be necessary should the ARC not be ready when antitrust immunity terminates on December 31, 1984. The Board was silent as to its position regarding such an extension if a request is made.
 
 
 [6]
 Sec. 1382. Pooling and other agreements
 (a) Filing and approval of agreements
 (1) Any air carrier or foreign air carrier may file with the Board a true copy, or, if oral, a true and complete memorandum, of any contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise), or a request for authority to discuss possible cooperative working arrangements in force on October 24, 1978, or thereafter entered into, or any modification or cancellation thereof, between such air carrier or foreign air carrier and any other air carrier, foreign air carrier, or other carrier.
 (2)(A) The Board shall by order disapprove any contract, agreement, or request filed pursuant to paragraph (1) of this subsection, whether or not previously approved by it, that it finds to be adverse to the public interest or in violation of this chapter, and shall by order approve any contract, agreement, or request, or any modification or cancellation thereof, that it does not find to be adverse to the public interest, or in violation of this chapter, except that--
 (i) The Board may not approve or, after periodic review, continue its approval of any such contract, agreement, or request, or any modification or cancellation thereof, which substantially reduces or eliminates competition, unless it finds that the contract, agreement, or request is necessary to meet a serious transportation need or to secure important public benefits, including international comity or foreign policy considerations, and it does not find that such need can be met or such benefits can be secured by reasonably available alternative means having materially less anticompetitive effects;
 (ii) The Board may not approve any contract or agreement between an air carrier not directly engaged in the operation of aircraft in air transportation and a common carrier subject to subtitle IV of this title, governing the compensation to be received by such common carrier for transportation services performed by it; and
 (iii) the Board may not approve any such contract or agreement, affecting interstate or overseas air transportation, or any modification or cancellation thereof, that limits the level of capacity among air carriers in markets in which they compete, that fixes rates, fares, or charges between or among air carriers (except for joint rates, fares, or charges).
 (B) In any proceeding before the Board involving the application of the standards set forth in subparagraph (A)(i) of this paragraph, the party opposing the proposed contract, agreement, or request shall have the burden of proving the reduction or elimination of competition, and the availability of alternative means having less anticompetitive effects, and the party defending the proposed contract, agreement, or request shall have the burden of proving transportation need or public benefits.
 Sec. 1384. Antitrust exemption
 In any order made under section 1378, 1379, or 1382 of this title, the Board may, as part of such order, exempt any person affected by such order from the operations of the "antitrust laws" set forth in subsection (a) of section 12 of Title 15 to the extent necessary to enable such person to proceed with the transaction specifically approved by the Board in such order and those transactions necessarily contemplated by such order, except that the Board may not exempt such person unless it determines that such exemption is required in the public interest. Notwithstanding the preceding sentence, on the basis of the findings required by subsection (a)(2)(A)(i) of section 1382 of this title, the Board shall, as part of any order under such section which approves any contract, agreement, or request or any modification or cancellation thereof, exempt any person affected by such order from the operations of the "anti-trust laws" set forth in subsection (a) of section 12 of Title 15 to the extent necessary to enable such person to proceed with the transaction specifically approved by the Board in such order and with those transactions necessarily contemplated by such order.